# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:08CR00002 |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **AMY JOYELL HICKS**, ) | By: James P. Jones |
| ) | Chief United States District Judge |
| Defendant. ) | |

*Zachary T. Lee, Assistant United States Attorney, Abingdon, Virginia, for United States; Nancy Dickenson, Assistant Federal Public Defender, Abingdon, Virginia, and Christine Madeleine Lee, Legal Research and Writing Attorney, Office of the Federal Public Defender, Roanoke, Virginia, for Defendant.*

In this criminal case, the defendant was acquitted of all charges except one, to which the jury could not agree. The defendant now seeks to prevent the government from retrying her on the remaining charge, based upon the doctrine of collateral estoppel. I find, however, that the facts permit a retrial.

I

The defendant Amy Joyell Hicks was charged along with codefendant Darrell Jack Kiser in a multi-count Indictment relating to the operation of the Angel Care Ambulance Service ("Angel Care"), located in this judicial district. Kiser, who was the owner of the business, pleaded guilty and was sentenced. Hicks, an employee,

went to trial and was acquitted by the jury of all counts except Count One, charging her with health care fraud in violation of 18 U.S.C.A. § 1347 (West 2000).

The jury could not agree as to Count One and a mistrial was declared. The defendant then filed a Motion to Dismiss, contending that under the doctrine of collateral estoppel, the jury's acquittals on the other charges precluded a retrial on Count One. The defendant's position is that by acquitting her of the other charges, "the jury necessarily decided that [she] did not engage in the conduct that would support any future conclusion that [she] committed health care fraud as charged in Count One." (Def.'s Reply Brief 3.) Put another way, the question here is "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Ashe v. Swenson*, 397 U.S. 436, 444 (1970) (internal quotation marks and citation omitted).

The Motion to Dismiss has been briefed and argued and is now ripe for decision.[1] For the reasons stated, I find that a retrial on Count One is not barred.

---

[1] There was a considerable delay in submitting the motion, for good reasons. The parties first requested the court to defer decision because of the pendency of a Supreme Court case, *Yeager v. United States*, No. 08-67, certiorari granted on November 14, 2008, argued on March 23, 2009, and decided on June 18, 2009. 129 S. Ct. 2360. When *Yeager* did not fully resolve the Motion to Dismiss, it was necessary for the parties to obtain preparation of the transcript of the three-day trial and further brief the issues.

II

At trial, the government presented evidence showing that Angel Care employees had submitted fraudulent billing information so that the company could collect payments from Medicare or other third-party health care payors.

The alleged criminal conduct revolved around the ambulance transportation of dialysis patients. Each time Angel Care transported a patient, employees filled out a "trip sheet." (Trial Tr. 32, Feb. 10, 2009.) These forms contained basic information such as a patient's name and address, as well as an open space in which Angel Care employees wrote a narrative of the trip. Medicare would not pay for the trip if a dialysis patient was ambulatory or in a wheelchair. Instead, Angel Care would only be reimbursed if a patient could not walk and rode on a stretcher.

To ensure a steady stream of payments, a simple scheme was used. Employees wrote narratives that stated patients could not walk and had traveled on a stretcher when, in fact, the patients could walk and rode in the ambulance's seats. Angel Care then submitted the falsified sheets to Medicare or insurance companies, which unwittingly paid for the trips.

Angel Care also developed a system in which the staff completed trip sheets weeks before the actual transport of a patient. These "rubber-stamped" trip sheets contained a falsified narrative that claimed a patient could not walk and was

transported on a stretcher. (Trial Tr. 76, Feb. 10, 2009.) Ambulance drivers and emergency medical technicians ("EMTs") were told that they should use the rubber-stamped trip sheets so that Angel Care could comply with government and insurance regulations. Nevertheless, most employees knew the real reason for the phony sheets — if the firm did not use them, Angel Care was in danger of not paying its employees.

Initially, Hicks worked at Angel Care as an EMT and transported patients. Later, she worked as an office manager responsible for scheduling and training staff. In addition, Hicks had some responsibilities related to billing.

The Indictment charges Hicks in fourteen separate counts. Count One charges that between December 2004 and September 2007, she and Kiser "knowingly and willfully executed or attempted to execute a scheme or artifice to defraud any health care benefit program." (Indictment, Count One ¶ 2.) Count Two charges that she and Kiser conspired to commit wire fraud and health care fraud. Counts Three through Eight charge Hicks with six separate incidents of wire fraud, in violation of 18 U.S.C.A. § 1343 (West 2000 & Supp. 2009), allegedly by faxing fraudulent trip sheets on different dates to the Medicare billing agent. Counts Nine through Fourteen reference the same incidents, and charge her with making or using a false material

document in a matter within the jurisdiction of the United States government, in violation of 18 U.S.C.A. § 1001(a) (West 2000 & Supp. 2009).

At oral argument on the present motion, Hicks asserted three main points. First, Hicks argued that her conspiracy acquittal precludes re-litigation of the health care fraud charge because the evidence required the conclusion that the jury had determined an agreement existed between Hicks and others. Hicks asserted it "defies all concept of probabilities" that Hicks could have acted alone because health care fraud is "inherently cooperative."

Hicks' second argument was that her acquittal on Counts Three through Fourteen precludes re-litigation of the health care fraud count. The only evidence of fraudulent trips presented at trial, Hicks asserted, were six trip sheets for patient Floyd Raines. The health care fraud charge, Hicks argued, depended solely upon "the act of faxing or submitting" the false trip sheets related to Raines.

Finally, Hicks argued that a retrial is precluded because the health care fraud charge depended entirely upon the facts underlying counts Three through Fourteen, on which the jury had acquitted Hicks.

The prosecution countered that the conspiracy acquittal did not preclude re-litigation of the health care fraud charge because the crime of conspiracy involved different elements than the crime of aiding and abetting. The government also

asserted that the jury's acquittal on Counts Three through Fourteen did not preclude a retrial on the health care fraud charge because the government had presented evidence at trial other than the fraudulent trip sheets related to Raines.

III

In *Ashe*, the Supreme Court held that under the Double Jeopardy clause, the government may not re-litigate any issue necessarily decided by a jury's acquittal in a prior trial. 397 U.S. at 446. To determine what a jury decided, a court should "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Id*. at 444 (internal quotations marks and citation omitted). If the issues are identical, and the jury's acquittal necessarily decided the issue, the prosecution cannot re-litigate the issue by presenting "the same or different" evidence to a jury. *Id*. at 446.

The jury's conspiracy acquittal does not preclude the retrial of Hicks for health care fraud, or aiding and abetting the crime, because the two charges do not share identical elements. To convict Hicks of conspiracy to commit health care fraud the government had to prove beyond a reasonable doubt that (1) Hicks entered into an

agreement with at least one other person; (2) the purpose of the agreement was to commit health care fraud; and (3) during the agreement, one of the conspirators knowingly performed at least one overt act to further the conspiracy. The charge of health care fraud, or aiding and abetting health care fraud, differs because conspiracy "involves the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting." *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir. 1975). A health care fraud charge also requires that the defendant make a false statement or misrepresentation to further the fraudulent scheme. This is a more specific, and different, requirement than conspiracy's overt act element. The two charges may have similar aims, but they are not identical.

In addition, under the doctrine of collateral estoppel, a retrial of Hicks is permissible because the record does not show that the jury's acquittal necessarily determined Hicks had an agreement with others.

Based upon the testimony of former Angel Care employees, the jury could have concluded an agreement existed. But it is not clear that the jury's acquittal actually and necessarily determined an agreement existed.

Of the eight Angel Care employees who testified at trial, four offered testimony indicating that a general understanding existed about the falsification of trip sheets.

EMT Valerie Nutter testified it was "common knowledge" that Angel Care managers submitted falsified trip sheets for insurance payments. (Trial Tr. 18, Feb. 11, 2009.) EMT Amanda Barnett echoed this sentiment when she testified that she had submitted falsified trip sheets because "it's just what everybody else was doing." (*Id*. at 34.) Ambulance driver Shane Gilland's testimony was similar. Gilland testified that Hicks specifically told him the EMTs and the office staff used the falsified trip sheets "in order to be paid." (*Id*. at 45-46.) Tammy Tomes, another office manager, stated that she had discussed the questionable practice with Hicks who responded that she knew the practice was wrong, but that Kiser, Angel Care's owner, had "always done it this way." (*Id*. at 83.)

Thus, as Hicks argues, a jury could have reasonably concluded that Angel Care employees operated with a common understanding about the fraudulent trip sheets. But the record also indicates that the lack of an agreement may have served as grounds for the jury's acquittal.

To begin with, Hicks' confession to law enforcement agents did not mention any agreement regarding the falsified sheets. Rather, Hicks stated that once she became the office manager she "continued things as they were prior to" her working in the office. (Gov't Ex. 21.) Hicks related that she knew the call sheets included false information. Yet, she continued the fraudulent practice because otherwise,

employees would not get paid. This does not demonstrate Hicks had an agreement with others. Hicks may have participated with other employees in a joint activity, but her admissions do not indicate she entered into an agreement.

Further, the testimony of Angel Care employees did not clearly demonstrate that Hicks had an agreement with others to commit health care fraud. Four of the eight employees offered testimony which the jury could have relied upon in reaching a determination that an agreement existed. However, the testimony of four other employees failed to indicate there was a common understanding. Michael Colley, Mary McCune, Sharon Castle, and Brian Hancock each testified that Hicks showed them the rubber-stamped trip sheets with phony narratives. But these employees stated they were free to, and often did, complete their own trip sheet narratives. Hicks, the employees testified, did not force them to use the fabricated trip sheets. If anything, this testimony indicated the lack of an agreement.

Because it is not evident that the jury's acquittal actually and necessarily determined that an agreement existed, the "'[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel.'" *United States v. Ruhbayan*, 325 F.3d 197, 203 (4th Cir. 2003) (quoting *Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970)).

Hicks second argument is that the jury's acquittals on Counts Three through Fourteen foreclosed a subsequent retrial of Hicks on the charge of health care fraud. Hicks asserted that the government's evidence for these counts rested solely upon six trip sheets related to Raines. Hicks argued that "there are no other trip sheets to support the health care fraud count" and that a "health care fraud conviction depends in its entirety on the facts underlying counts Three through Fourteen." But these conclusions fail to consider all of the evidence.

At trial, government investigators testified they had conducted surveillance on the six dates listed in the indictment. On these days, they watched Raines walking out of his home and riding in an ambulance seat. Investigators then obtained the trip sheets Angel Care had submitted for Medicare billing, which stated that Raines could not walk and had ridden on a stretcher. The government also introduced exhibits showing that Angel Care had received payments from Medicare for these trips.

Yet, on cross examination, investigators stated that Hicks had not traveled with Raines on the six dates in question. Agents did not know which Angel Care employee had faxed the six trip sheets for billing. In her interview, Hicks told Agent Jeffrey Overbeck that she had written the narratives for the rubber-stamped trip sheets. But Overbeck also testified that each sheet was signed by the EMT who had

transported Raines, and not Hicks. Hicks' confession did not mention the specific dates on which she completed or faxed any rubber-stamped trips sheets.

Thus, the government's evidence did not directly link Hicks to the creation or submission of the fraudulent trip sheets for the six dates in question. Despite this, the government still produced sufficient evidence to allow a reasonable juror to conclude that during a three-year period, Hicks committed, or aided another with the commission of, health care fraud.

To begin with, Hicks admitted to investigators that as the office manager she was "in charge" of faxing trip sheets for billing and that she had faxed inaccurate trip sheets. *Id*. at 79. Further, after her arrest, Hicks told officials that she completed trip sheet narratives and had faxed rubber-stamped trip sheets for the four patients named in the Indictment. Investigators testified that Hicks had informed them that she had trained other Angel Care employees on how to "word" phony trip sheets so Medicare would reimburse Angel Care. *Id*. at 66.

Angel Care employees Nutter and Tomes testified that Hicks had instructed them how to falsify trip sheets and that Hicks had faxed rubber-stamped trip sheets for Medicare payments. In addition, Tomes testified that Hicks had stated she transported patients in her own car and she had Angel Care fraudulently bill Medicare for these trips. Angel Care patients John Sheffy and Rosa Hoosier testified that when

Hicks worked as an EMT they were often transported via ambulance when they could walk or had not traveled on a stretcher. Neither patient recalled being billed for the service. In fact, Sheffy had retained his Medicare statements, which indicated that Medicare had paid for all of his ambulance rides. Hoosier said she was never billed by Angel Care, Medicare, or Anthem Blue Cross Blue Shield, her second insurer, even though she had ridden with Hicks in taxis or Hicks' private vehicle, or when she rode in the ambulance despite being able to walk.

From this broad array of evidence, a juror could reasonably conclude that Hicks knowingly executed, or assisted with, a plan to defraud a health care insurer by making false material representations in connection with the payment of health care benefits.

Contrary to Hicks' final argument, the Indictment's specificity does not preclude the government from retrying Hicks on Count One. The Indictment alleges that Hicks was "responsible for preparing and submitting claims" for Medicare and a private insurance company. The Medicare claims related to four Angel Care patients and the private insurance claims related to three patients other than Raines. The Indictment states that Hicks instructed Angel Care employees to falsify trip sheets although Hicks knew that the four patients could walk. Finally, the Indictment alleges that between December 2004 and September 2007, Angel Care received

$300,000 from Medicare and $50,000 from the private insurance company for the transport of the patients. Count One of the Indictment states that Hicks "knowingly submitted and caused false claims to be submitted" to Medicare and the private insurance company.

Contrary to Hicks' argument, this charge is not entirely dependant upon Hicks faxing false trip sheets for Raines on six dates. Rather, the Indictment's broad allegations includes a host of conduct related to the phony trip sheets submitted for three patients other than Raines during a three-year period. Thus, the jury's acquittal on Counts Three through Fourteen did not necessarily determine the elements of the health care fraud charge.

In addition, because the allegations for Count One included conduct that occurred between 2004 and 2007, the jury's acquittals do not preclude a health care fraud charge as it relates to Raines' transportation. Rather, the acquittal only precludes retrying Hicks on Count One as it relates to Raines transport on the six dates listed in the original Indictment. It is fair for the government to retry Hicks on the charge of health care fraud for any other days Raines was transported.

IV

Hicks has put forth two arguments regarding the exclusion of evidence during retrial. At oral argument, Hicks asserted that under the doctrine of collateral estoppel, her acquittal on Counts Two through Fourteen prevented the government from introducing any new evidence at a subsequent retrial for Count One. In her Motion to Exclude Evidence, Hicks argued for the exclusion of evidence previously presented at trial that related to Counts Two through Fourteen.

Under *Ashe*, the jury's acquittal of Hicks precludes the introduction of previous, or new, evidence at a subsequent trial only if the jury's decision necessarily and actually determined issues that are identical to those posed by a health care fraud charge. The government cannot be collaterally estopped from introducing evidence related to the conspiracy charge because health care fraud and conspiracy do not share identical elements. Further, the basis of the jury's conspiracy verdict, what it actually and necessarily decided, is unclear.

The jury's acquittal of Hicks on Counts Three through Fourteen determined that Hicks did not participate, or aid, in the creation or submission of Raines' falsified trip sheets on the six dates in question. The verdict did not, however, necessarily and actually determine whether Hicks participated in a plan to defraud Medicare or a private insurance company regarding the transport of four other patients during a

three-year period.  Thus, at retrial, the government is not precluded from introducing new evidence of health care fraud nor is the government precluded from using evidence presented at trial that relates to Angel Care's general operations, Hicks' confession, and the transportation of the three patients other than Raines.  Further, because counts Three through Fourteen related to specific dates on which Raines was transported, the government is free to introduce evidence related to Raines' transport on dates other than the ones listed in the Indictment.

Hicks is correct, however, in asserting that the government may not introduce evidence related to Raines' transport on the six dates listed in the indictment.  The jury's acquittal for those charges clearly determined that Hicks did not knowingly make, or assist with the making of, a false material misrepresentation on the six dates in question.

V

For these reasons, it is **ORDERED** that the defendant's Motion to Dismiss (DE 89) is DENIED and the Motion to Exclude Evidence (DE 89) is GRANTED in part

and DENIED in part. The clerk is directed to set the case for trial as to Count One as soon as convenient within the remaining Speedy Trial Act time.[2]

                                                                     ENTER: April 28, 2010

                                                                     /s/ JAMES P. JONES
                                                                     Chief United States District Judge

---

[2] The Speedy Trial Act, 18 U.S.C.A. § 3161(b) (West 2000), requires a trial within 70 days of a mistrial, excluding the authorized periods of delay enumerated in 18 U.S.C.A. § 3161(h) (West 2000 & Supp. 2009). In this case, the hung jury as to Count One occurred on February 12, 2009. On February 18, 2009, after six days had run, the court entered an order on the motion of the defendant extending the Speedy Trial Act time, in conformity with § 3161(h)(7)(A). Thereafter, on April 29, 2009, the defendant filed the present Motion to Dismiss, producing another authorized period of delay through the date of hearing of the motion on February 24, 2010. *See* § 3161(h)(1)(D). The period during which the motion was under advisement, not to exceed 30 days, was also an authorized period of delay. *See* § 3161(h)(1)(H). Accordingly, there are 32 days left of Speedy Trial Act time.